Statement of the Case.
MONROE, J.
In August, 1901, defendants (F. A. Noullet & Co.) undertook to build, for the city of New Orleans, a house of detention (otherwise called police jail) and in October following they made a subcontract with plaintiff (who signed same as agent of the Diebold Safe & Lock Company, of Canton, Ohio), whereby the later undertook to furnish part of the material and labor needed for the execution of the principal contract, to wit, “to erect and place in position, in good working order, all cages, cells, metal iiartitions, iron gratings, iron stairways, newel posts and railings, set all box framed iron doors, * * * erect all hammock supports and all iron shutters, substantially, as described in the specifications, etc., at the agreed price of $22,750.00,” and plaintiff, in turn, subcontracted with Charles Bedell and Joseph Sutton & Son, of New Orleans, the Carnegie Company, of Pennsylvania, and the Diebold Safe & Lock Company, of Canton, Ohio, for the cast-iron work and the cell work, as called for by his contract with defendants.
At a certain stage in the progress of the work, plaintiff demanded a payment on account, and was met with a counter demand for damages alleged to have been sustained by defendants, by reason of his (plaintiff’s) failure to conform to his contract. The parties, then (on June 4, 1902), through their respective counsel, entered into what may be called an operating agreement, whereby, on certain conditions and without prejudice to the original contract, it was stipulated that plaintiff should be paid, in cash for certain east and wrought iron work, upon the acceptance of the same by the city engineer. The execution of this agreement was guarantied by the counsel, respectively, and was followed, on July 24, 1902, by another agreement, similar in character. In January, 1903, plaintiff brought suit on the agreement of June 4th, and some nine days later brought another suit on the agreement of July 24th, and the two suits having been consolidated, he filed an amended petition, purporting to set forth his entire claim, substantially, as follows, to wit:
*891 Amount called for by contract.. $22,750 00
Less cash received................$11,682 71
“ freight paid................. 1,246 78
“ amount paid for columns... 87 00 13,016 49
Balance due on contract. $ 9,733 51
Extra work — In connection with
roof and porch... $ 200 00
*• « —Rendered necessary
by reason of discrepancies between building, as constructed, and specifications .... 608 60 708 60
Total amount claimed.... $10,442 11
The parties made defendants were Noullet & Go., their attorneys (as guarantors of the contract of June 4, 1902), the National Surety Company (which signed the bond of Noullet & Co. with the city), and the city of New Orleans. The suit was discontinued as to the attorneys of Noullet & Co., and no complaint is made of the judgment of the district court, in so far as it rejects the demand of the plaintiff against the surety company, or in so far as it condemns the city of New Orleans. , Noullet & Co., after having answered in each of the suits mentioned, filed an answer, in the consolidated case, which purports to set forth their position with reference to the whole matter, including their demands in reduction of the claim asserted against them, and, in reconvention, for various items representing the loss and damages alleged to have been sustained by them by reason of the manner of execution or inexecution of plaintiff’s contract. In this answer, they omit a claim, asserted in a previous answer, for damages alleged to have been sustained by reason of delay, in July, 1902, in the delivery of certain cast-iron columns, but, as the matter was litigated in the district court, at the instance of plaintiff (under circumstances which will be explained hereafter), and has been dealt with,‘'throughout, as though presented by the final answer referred to, it will be so dealt with here. The items constituting defendant’s claim in reduction and reconvention (including that for damages sustained by delay in July, 1902) are, substantially, as follows:
1. Cash paid.................................. $11,682 71
2. Freight paid.............................. 1,246 78
3. Taking down and putting up columns.. 61 50
4. Cement, lost.............................. 195 96-
5. Painting iron and steel work........... 331 40
6. Paid Bedell, for iron work............... 354 55
7. Shortage in weight of iron.............. 247 79
8. Wages of watchmen and foremen, December to April......................... 704 00
9. Salary of bookkeeper, December to April ................................... 140 00
10.Time lost by defendants, December to April .................................... 2,800 09
11. Damages caused by delay in July, 1902. Expenses per day, July 1 to July 14: Three watchmen at $1.50 ............. $ 4 50
Two clerks........ 9 50
One bookkeeper... 1 15
Kent of hoisting machine ......... 3 33
Engineer .......... 2 75
Time of defendants 30 00
Wear and tear, etc 50 00
Total per day.. $101 23
Total for 14 days ......... $1,417 23
Paid Bedell, for columns,. 87 00 1,504 23
12. Increased cost of brick work through delay .................................... 3,000 00
13. Increased cost of slating, through delay .............'.......................... 594 00
14. Damage to business and reputation.... 5,000 00
The explanation above referred to is as follows:
Joseph Sutton & Son, subcontractors, or undertakers (under plaintiff), for certain of the wrought and cast iron work, brought suit against plaintiff for a balance of $1,290.43, which they alleged was due them, to which suit plaintiff answered that Noullett & Co. were claiming damages of him on account of the alleged failure of Sutton & Co. to execute their subcontract, and he prayed that Noullet & Co. be called Into the case. Noullet & Co. thereupon (after excepting) appeared and answered that, by reason of delay and failure in the execution of that part of plaintiff’s contract which had been sublet to Sutton & Son, they had sustained loss and damage to the amount of $1,504.23. And, subsequently, through receivers and liquidators (who had been in the meanwhile appointed to take charge of the affairs of the firm), they further answered that their claim against *893 Noyes for such damages was fully set forth in their pleadings in the suits filed by him, which pleadings they adopted as part of their defense and demand in reconvention.
It was agreed that the testimony taken in the case of Sutton & Son v. Noyes et al. should be used in the consolidated cases of Noyes v. Noullet & Co. et al., and the cases were tried together, with the result that, in the consolidated cases (or ease, as we shall call it), the district court gave judgment for plaintiff for $7,837.16, as the balance due under the contract, and for $508.60, as due for extra work; the whole with legal in-' terest from January 1, 1903, and costs, including the costs incurred, subsequent to June 24, 1903, in the ease of Sutton & Son. The judgment so rendered is explained by a memorandum, prepared by the judge and thereto attached, reading as follows:
Memorandum of Judgment.
Am’t due L. T. Noyes as per contract ........................ $22,750 00
Less cash payments..............$11,682 71
“ freight paid.................. 1,246 78
** paid extra for columns.... 87 00
44 expense and damage for delay, from July 1 to July 14, 1902 (10 days)...... 432 80
44 Expense and damage for delay, March 1 to April 16, 1902, 47 days at $31.15.. 1,464 05
Total credits.............. $14,912 84
Balance due * on Noyes* contract ................. $ 7,837 16
Due Noyes for extra ■work .................... 508 60
Total due Noyes.......... $ 8,345 76
Detail of daily expenses and damages from July
1 to July 14, 1902, 10 days:
3 watchmen, 1.50, 1.50, 1.25......................$ 4 25
2 foremen, 6.00, 3.50............................. 9 50
1 bookkeeper at $35 per month.................. 1 15
Rent of hoisting machine........................ 3 33
Time of firm...................................... 25 00
$43 23
Detail of daily expenses and damages from March 1 to April 16, 1902, 47 days:
3watchmen, 2.00, 1.50, 1.50......................$ 5 00
1 bookkeeper at $35 per month................ 1 15
Time of firm...................................... 25 00
Total daily expense and damage........$3115
Plaintiff has appealed, and defendants have answered praying that they be allowed the amount originally demanded. In the suit of Sutton & Son v. Noyes et al., there was judgment for plaintiff in the sum of $771.13 with interest and costs; the court having deducted from the amount ($1,290.43) claimed the sum of $432.30, as damages for delay caused by Sutton & Son (being at the rate of $43.23 per day for 10 days as per the foregoing memorandum), and $87, as the amount paid for columns which Sutton & Son should have-supplied; and, from the judgment so rendered, Sutton & Son have appealed to the Court of Appeal, where the matter is now pending.
Opinion.
The record before us shows that, in the negotiations which preceded the contract here sued on, plaintiff led defendants and their-representatives to believe that he was authorized to act in the capacity in which he signed the contract, to wit, as the agent of the Diebold Safe & Lock Company, of Canton, Ohio, a concern of reputed good standing, and that, in the belief that they were contracting with that company, they waived the requirements, which would otherwise-have been insisted on, that the subcontract- or furnish bond and fix a time for the delivery of the material and completion of the work called for by his contract. Some time later, whilst the work was in progress, or being delayed, plaintiff gave defendants to understand that the contract was an individual affair of his own, for which the Diebold Safe & Lock Company, of Canton, Ohio, was in no wise responsible, and he has testified and has called the president of that company to testify to that effect. We find it unnecessary to comment on the testimony so given (further than to say that it does not afford a satisfactory explanation of the situation), for the reason that, there being a fund in-bank sufficient to meet the demands of the litigants, it is practically immaterial for the purposes of this case whether the contract is really that of Noyes or of the com *895 pany that he appeared to represent when he signed it. Noyes’ announcemént upon the subject, however, excited a suspicion and distrust which may, in some degree, have influenced the subsequent relations between Noullet & Co. and himself, and for which he, alone, is to blame. The contract between Noullet & Co. and the city was entered into upon August 8, 1901, and called for the completion .of the building within six months from that date, under penalty of $100 per day for each day’s delay. The contract between Noullet & Co. and plaintiff was entered into on October 26, 1901, and, whilst plaintiff did not bind himself to furnish the material and labor called for, within a specified time, it abundantly appears that he was familiar with the contract between Noullet & Co. and the city, and that his contract was made with reference thereto. It is shown, moreover, that though he stated that the Carnegie Company, from which a portion of the material to be furnished by him was to be obtained, would not bind itself with respect to date of delivery, he gave defendants to understand that they would begin their deliveries in about six weeks, and would thereafter keep them up so that the work might go steadily forward. And, in his subcontract with Sutton & Son, the latter bound themselves to “furnish all material required * * * in such quantities and at such times as shall be required by Messrs. Noullet & Co. * * * so that no delay may be caused to the said contractors,” etc.
Considering the different items of defendant’s demand in reduction and reconvention, we find as follows:
1. Cash paid..................... $11,682 71
2. Freight paid.................. 1,246 78
The claim for reduction represented by these two items is admitted by plaintiff in his petition.
3. Taking down and putting up columns $61 50
In their answer, in the case of Sutton & Son v. Noyes, defendants allege that the total damage sustained by them in consequence of delay in or manner of execution, or inexecution, of that part of the contract here sued on which had been sublet by Noyes to Sutton & Son, amounted to $1,504.23. By referring to their answers in the suits which had been brought by Noyes, which answers they adopted, we find that this sum is made up of two items, to wit:
Damages by reason of delay, 14 days at $101.23...................... $1,417 23
Amount paid Bedell for columns.... 87 00
Total ........................ $1,504 23
And, of this amount, there was allowed the item of $87 as the cost of the columns, and $432.30 on account of delays in the work. Under these circumstances, and as the claim thus asserted was intended to be, and was, made the basis of the judgment in favor of Sutton & Son, we are of opinion that defendants cannot now be permitted to change their position in the matter; the proof offered in support of the additional amount here claimed having been made the subject of objection by opposing counsel.
4.Damages by loss of cement........$195 96
It appears that defendants had purchased some 250 sacks of cement which they stored under an open shed, and they allege that, by reason of delay for which plaintiff is responsible, the cement became air slacked and worthless; that they also lost the sacks, valued at 10 cents each; and that they were subjected to some expense in having the material removed. It is not shown that the cement might not have been preserved if properly cared for, and we infer from the testimony that it might have been used in place of other cement which was subsequently received and used.
5.Painting of structural steel and wrought and cast iron work......$331 40
*897 The evidence shows that defendants were subjected to this expense, but plaintiff takes the position that he is not responsible, because the painting in question was no part of his contract. The contract reads:
“(6) Paint: After reception at the building and before being placed in position, 8.11 steel members shall be thoroughly cleaned and freed of scale or rust, then given two coats of best grade metallic paint, mixed in proper proportions with boiled and raw linseed oil. All wrought and cast iron members, before leaving the factory, shall be thoroughly cleaned, freed of scale or rust, and given one coat of metallic paint of the quality described in the preceding sentence. On reception at building, before being placed in position, -they .shall, again, be thoroughly cleaned, freed from scale' or rust, and given a second coat of specified metallic paint.”
The contention that, by this stipulation, defendants imposed on themselves the obligation of painting the steel and iron members, which plaintiff was contracting to furnish, is not well founded.
6.Amount paid to Bedell............$354 55
In this amount is included the charge of $87, for columns, which is admitted by plaintiff in his petition and deducted from the amount otherwise alleged to be due, and which constituted, in part, the basis of the judgment in the suit of Sutton & Co. v. Noyes. The balance of said amount is made up of the following items, to wit:
1. Cutting out I beams..............$ 5 50
2. Dialling I beams................. 1 75
3. Drilling and sawing beams and chan- , neis .......................... 4 00
, 4. Repairing I beams............... 1 75
5. Drilling and sawing beams........ 8 00
6. Sawing and drilling beams........' 21 00
7. Altering I beams and furnishing channel ....................... 6 30
8. Drilling and furnishing bolts for heel plates ......................... 20 00
9. Cast iron separators (2)............ 50
10. Cast iron separators (2)........... 50
11. Drilling and. sawing beams and columns and furnishing 2 beams.. 20 00
12. Shipping columns................ 5 50
13. Drilling and shipping beams and columns ;........................ 6 50
14. Cutting 20 openings in shutters in insane cells..................... 100 00
15. Making and putting up bottom (batten) iron in insane cells.......... 65 00
16. Altering two stag bolts............ 1 00.
There is no doubt that most of the money represented by these items was paid out by defendants for work which was either included, or intended by defendants to have been included, in plaintiff’s contract, and, so far as the items 1 to 8 (inclusive, amounting to $68.30) are concerned, we think plaintiff had sufficient notice that the work was necessary and would be done. As to the items from 9 to 16, inclusive, however, either it is not shown that any demand was made on him, or the work belonged to the contract .of Sutton & Son, and was not charged for in the suit brought by that firm, or the charge for such work is not distinguished from that for work done in connection with the beams, or, as in the case of the items for work done in the insane cells, it appears that the work was made necessary by reason of the fact that the actual dimensions of the cells were not as called for by the specifications with reference to which plaintiff furnished the equipment.
7.Shortage in weight of iron........$247 79
The amount here charged represents the difference in value, resulting from the difference in weight, between the material called for by the contract with the city and that delivered. The original specifications called for a certain weight, but plaintiff submitted others which called for metal of a lighter weight. These were returned to him with explicit instructions that the weight called for in the original specifications must be supplied. He now asserts that he had particular specifications prepared for the purposes of his subcontract, and that the material was furnished in accordance therewith. It does not appear that Noullet & Co. were, aware of the fact that the specifications thus:. supplied by plaintiff did not conform to those, of the city; and the bookkeeper of Noullet & Co. testifies that: ...
*899 ' “The city''took rip' this particular" shortage, which was complained of, and which does really exist, and deducted from Noullet & Co., in the settlement,- the’ sum of $247.79.”
We fail’to, find any satisfactory rebuttal of this testimony or attempt at proof that the shortage did not exist, and we are of opinion that plaintiff is liable for it.
8. Wages of watchmen, from December 4, 1901, to April 12, 1902.. .$ 704 00
•9. Salary of bookkeeper from December 4, 1901, to April 12, 1902.. 140 00
10. Time lost by defendants from December 4, 1901, to April 12,' 1902 ........................ 2,800 00
As has been stated, plaintiff contracted with defendants on October 26, 1901, with full knowledge of the fact that their contract with the city required that the building should be completed by February 8, 1902, and whilst it is true that he refused to bind himself to make delivery within a specified time, and it may be true that defendants could not, under the circumstances, have then expected to complete the building within the time stipulated, it .is, also true that plaintiff was bound to make his deliveries within a reasonable time; and, to hold that he was not obliged to comply with his contract within a period during which such compliance would have been of any avail, "with reference to its main purpose, would be to hold, in effect, that he was not obliged to comply within the time contemplated by the contract. The questions to be determined, then, are: What delays were there, beyond such reasonable time? and what loss did defendants sustain by reason thereof? ' '
There is no doubt that plaintiff assured defendants, and their representatives, that his deliveries would begin within-six weeks from October 26, 1901. Mr. Cage '(of the law firm of Cage, Baldwin & Crabites, -at that time the attorneys of the defendants, but who were not .representing, them-, when 'this: case was tried), testifying concerning: the: negotiations which immediately preceded the making of the contract sued on, was interrogated, and answered as follows:
“Q. Mr. Noyes told you that he could not make such a contract [specifying time for delivery, under bond and with penalty, etc.) because the mills would not do it with him? A. Yes; and be said, beyond the shadow of a. doubt, that the first material would arrive here within six weeks. He said the Diebold Safe & Lock Company did not make the structural-steel,' and that he- would have to go to the others, and that they. would not put themselves under bon.d or penalty.” •
F. A. Noullet also testifies that:
“He [plaintiff] stated that the company that-he represented -[referring to the Diebold Safe &.Lock Company] was worth millions of dollars, and at no time would they delay any matter of delivering material, and he also stated that he would deliver the material for the first basement within six weeks, and thereafter would deliver the material so that the building would not be delayed at any time.”
Notwithstanding the -assurances so given, the first .shipment .of structural steel was not made until January 30, 1902, and the material so shipped was not delivered until February 28th. Other shipments followed, and other deliveries were made, until April 19th; but", for all practical purposes, there was -no. delivery of structural steel (without which, ■no progress could be made in the building beyond the putting up of the brick footings and-walls of the basement) until the date last mentioned, since the shipments and deliveries were made as described in the testimony following
By F.‘A:‘Noullet, defendant’s bookkeeper:
“Some of the shipments of steel beams began to arrive in the latter part of February, or early.part of March; but they were composed of mixed' shipments. There were beams in the first and' ‘second' 'floors and roof. They were mixed, an'd‘ 'it' was not until April thát they had sufficient steel beams to start upon the •basement walls.”
By Win. J. Hardee, city engineer:
“* * .* But the most serious delay, from a time standpoint, was in the receipt of the .steel and iron work, primarily, until the first .shipment, came,..and,'if I recall properly, when ■the first.shipment .did come, it-didn’t embrace *901 the parts that were first needed, and they lay there useless for a time, and could not be used. In other words, the parts that came first were to go into a different story, above, and there was that long delay which extended to something like five or six months. I don’t recall exactly — the records will show that — and there was another delay on account of the iron work which was sent there and which was condemned and had to be sent off and had to be relet.”
Instead:, therefore, of a delay of six weeks, between the date of the contract and the first available delivery, there was a delay of five months, less seven days, or from October 26th to April 19th following. A portion of this delay is accounted for (to the extent that it is shown that it was unavoidable, so far as plaintiff was concerned) by the fact that defendants required the shipments to be made by a particular railroad, the average time of delivery by which was about four weeks. But, allowing half that time, as unnecessary, and allowing plaintiff an additional margin of four weeks, over and above the six weeks, within which he had said that he would begin to make practicable and available deliveries, or, say, twelve weeks from the date of the contract, and there are still (up to April 12th, the date alleged in the petition) 83 days of delay for which plaintiff has not satisfactorily accounted. It is asked:
“Why should Noyes be liable in damages for delay in the arrival of Carnegie material, which delays (?) ended April 19, 1902, when Noullet & Co. did not finish the work until more than a year and eight months thereafter, and this, notwithstanding the time limit of six months in Noullet & Co.’s contract with the city. Especially, when at least part of those subsequent delays were caused by other subcontractors, strikes, etc.?”
We are advised of no sufficient answer to this question, in so far as it may be directed to certain items in defendant’s claim, but it has no application to a loss which was the immediate result of the delay in question, as, ■ for instance, that resulting from the payment of employés who were kept idle by reason of the nonappearance of the material which plaintiff was to deliver. In arriving at this loss, however, it is evident that only the time for which the employés would have been paid if the material had been delivered should be considered, and hence, as it does not appear that the defendants worked their men on, or paid them for, Sundays or holidays, that Sundays and holidays should be deducted from the time lost by men who were paid by the day. As to defendants’ claim for the loss of their own time, we do not find that it rests upon a sufficient basis of law or fact. They were, at the date of the contract with plaintiff, and during its execution, general contractors, with other work on their hands besides that out of which this litigation arises, and, having a bookkeeper and foreman (for whose time they are allowed to recover) in charge, at the jail, we are unable to perceive why they should, also, have lost their own time (which was under their control and might have been devoted to the execution of other contracts or the obtention of new ones) in assisting those employés to do nothing; nor are we persuaded that such damages can reasonably be said to have entered into their contemplation, or that of plaintiff, when the contract sued on was made. It is shown that during the period here in question defendants retained in their employ three watchmen, at $2, $1.50, and $1.50, or a total of $5 per day, and a bookkeeper at $35 per month, so that the expense per diem was $6.15, and it appears from the calendar that, of the 83 days from January 20th to April 12th, inclusive, there were 12 holidays (11 Sundays and Good Friday) and 12 half holidays (Saturdays), making a total of 18 days to be deducted. We have, therefore:
Watchmen, 65 days at $5 a, day.......$325 00
Bookkeeper, 83 days at $35 a month.. 95 45
Total, of items 8, 9, and 10........$420 45
11. Damages occasioned by delay in July, 1902.......................$1,504 23
In this item there is again included the claim for $87 paid to Bedell for columns, *903 which has been, disposed of; the balance of the item being made up of the charges as hereinbefore set forth. It appears that when the deliveries of structural steel had been completed, in April, defendants supposed that they were in a position to go on with the work; but it was then found that a large proportion of the iron columns which had been furnished by Sutton & Son, and some of which had already been put in position, were defective; the defects having been carefully concealed by patches, or fillings, thickly covered with paint. In their answers to the second suit instituted by Noyes, and to the call made on them in the suit of Sutton & Son v. Noyes (tried with this case), defendants claim, as damages resulting from the condition thus stated, the amount represented by the item now under consideration, and we find that,- on the trial in the district court (of this, and the Sutton & Son’s suit), the following admission was placed on record, to wit:
“By Mr. Parkerson: We cannot claim anything in excess of 14 days, but we are not limited to the first 14 days. We can show it kept on until the 16th or 17th of July.”
The exhibit attached to the answer in which the claim is set up (answer in suit No. 69,488 of the district court), after setting forth the item, contains the following paragraph by way of recapitulation, to wit:
“Work cannot be resumed until the 14th instant, which will be 14 days idle, at $101.23, $1,417.23.”
As a matter of fact, defendants were delayed beyond July 14th, and we are of opinion that there is nothing in their defense to preclude them from recovering at least for 14 full days. The judge a quo, as we have seen, allowed damages for 10 days, upon the basis of $43.23 per day, including therein $25 a day for time lost by the two members of the firm of Noullet &■ Co. For the reasons which have been given, we are of opinion that this $25' (a day) should be deducted; but, on the other hand, that Noullet & Co. should recover for 14 days, instead of 10. In other respects, we agree with the judge a quo as to this item, and, accordingly, hold that defendants are entitled for 14 days delay in July, 1902, at $18.23 per day, or $255.-22.
12. Increased cost of brick work, through delays ..............$3,000 00
The witness F. J. Noullet propounds the following, as the theory relied on by defendants in support of this item, to wit:
“It was arrived at in this way: The brick work — Noullet & Co. could have let that contract to a responsible contractor * * * for $33,870, and this brick work cost Noullet & Co., in round figures, $35,000, or something like $1,100 more than if they had let to Mr. Wright. When a man uses his own time and proceeds with the work and pays for the work and labor, he figures to make at least 10 per cent, on $35,-000, and there should have been $3,000 profit on that work, added to the regular cost; that work really cost between $3,000 and $5,000 more than it should have cost them.”
Being asked whether the bid of $33,870 was the only bid that Noullet & Co. had for the brick work, the witness answers:
“No, sir; we also had a bid from Lapayre & Poree, but I think their bid was about $35,000, in round figures. They certainly expected to make 10 per cent, off of that amount.”
There is some other testimony to the effect that contractors usually expect, or hope, to make 10 per cent, profit on the subcontracts let out by them; but whether they make that profit, upon any particular subcontract, must, necessarily, depend on a variety of circumstances. In the instant case, we are not informed as to the. percentage of profit that defendants expected, 'or hoped, to make on the bids received by them, or whether either of the bidders on the brickwork would have done that work if his bids had been accepted; nor are we able to say, from the evidence in the record, that either of them would have been, prevented from doing *905 it by any delay for which plaintiff is responsible, and, upon the whole, we find no substantial basis upon which to rest a judgment for this item.
13. Increased cost of slating, through delay ........................$594 00
It appears that defendants sublet the contract for slating to Tom Steen, Jr., for $1,206; that Steen afterwards refused to do the work, on the ground that the price of slate and cost of labor had advanced; and that defendants did the slating at a cost of $594 in excess of the amount bid by Steen. But whether the price of slate and the cost of labor really did advance, and whether such advance occurred during the delay caused by plaintiff, or during the subsequent delay otherwise produced, we are unable to say, and there can be no recovery in this item.
14. Damages to business and reputation of respondents, owing to delays and defective and improper material furnished.........$5,000 00
There is no sufficient evidence to warrant a judgment for any part of the amount represented by this item. Defendants do not ask for any amendment with respect to the' $508.60 allowed plaintiff for extra work, and we find no error in the judgment appealed from in so far as it rejects^the demand for $200 for other work of that character.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount allowed plaintiff, as due under the contract sued on, from $7,837.16 to $8,497.44.
It is further adjudged and decreed that, in all other respects, said judgment be affirmed; the defendants, Noullet & Co., to pay the costs of the appeal.
NICHOLLS, J., takes no part, not having heard the argument.